UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

> USDC-SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC#:
> DATE FILED: FEB 23 2015

JOHN SACCHI, an individual, on behalf of
himself and all others similarly situated,

Plaintiff,

-against-

VERIZON ONLINE LLC and DOES 1
through 100, inclusive,

Defendants.

No. 14-cv-423-RA

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff John Sacchi brings this putative class action against Defendants Verizon Online

LLC ("Verizon") and Does 1 through 100.[1]  Before this Court is Verizon's motion to dismiss, or

in the alternative to stay and compel arbitration.  For the reasons that follow, Verizon's motion to

compel arbitration is granted and the case shall be stayed pending the completion of arbitration.

## BACKGROUND[2]

### I.  Plaintiff's Claims

Plaintiff, a resident of New Jersey, initially purchased DSL internet service from Verizon

in September 2005.[3]  (Lamison Cert. at ¶ 2.)  Plaintiff alleges that Verizon solicited him to purchase

---

[1] Verizon Communications Inc. was the original named defendant in this matter.  On consent of the parties and by Order dated January 16, 2015, Defendant Verizon Online LLC was substituted for Verizon Communications Inc.

[2] The undisputed facts are taken from Plaintiff's Complaint, the declarations filed in support of Verizon's motion, the exhibits attached thereto, and factual clarifications made at oral argument.  "The Court may properly consider documents outside of the pleadings for purposes of deciding a motion to compel arbitration."  Guida v. Home Savings of America, Inc., 793 F. Supp. 2d 611, 613 n.2 (E.D.N.Y. 2011).

[3] Plaintiff's DSL internet services were initially provided by an entity called Verizon Internet Services Inc. and its affiliate Verizon Online New Jersey – LLC.  (Glennon Cert. at ¶ 3.)  In or about January 2009, Verizon Internet Services Inc. became Verizon Online LLC, and in or about November 2010, Verizon Online – New Jersey LLC merged into Verizon Online LLC.  (Id.)  The parties do not dispute that the proper Defendants are now named in this action.

an "upgrade" in DSL internet speed from the "low" speed package to the "high" speed package for an increase of approximately $15.00 per month. (Compl. at ¶ 9.) Plaintiff purchased the upgrade in 2009. (Id.) Despite making the requisite payments, however, Plaintiff was unable to obtain internet speeds that were as fast as what he had obtained with his prior "low" speed package. (Id. at ¶ 11.)

Verizon informed Plaintiff that "due to the geographic distance between Plaintiff's residence and Verizon's Central Office . . . , the maximum DSL speed obtainable for Plaintiff's Internet access could . . . only be provided by the Verizon 'low' speed package . . . ." (Id. at ¶ 12.) According to Plaintiff, Verizon further acknowledged that "the same circumstances prevented countless other Verizon customers from obtaining the 'high' speed Internet access for which they had been charged increased monthly fees . . . ." (Id. at ¶ 13.)

On July 12, 2010, Plaintiff requested a refund of the upgrade fees he had paid, but Verizon refused the request and purportedly continues to do so. (Id. at ¶¶ 14-16.)

On January 23, 2014, Plaintiff brought this action on behalf of himself and all persons similarly situated, claiming conversion, fraud, and breach of contract.

Verizon responded by filing the instant motion, arguing that Plaintiff is contractually bound to submit his claims to arbitration and that the contract does not allow him to arbitrate his claims on a class or collective basis. Oral argument was held on January 15, 2015.

## II.    The Agreements

Plaintiff's initial DSL internet services were provided pursuant to a contract entitled the Verizon Internet Access Service Terms of Service (the "Original Agreement"). (Opie Cert. at ¶ 3.) At the time Sacchi ordered his internet service, Verizon's business practice was to send customers a "starter kit" that included the Original Agreement and a CD-ROM that the customer

2

would use to register for the services. (Chennupati Cert. at ¶¶ 3, 5.) As part of the registration process, the customer was required to review and affirmatively accept or decline the Original Agreement, which could be viewed in its entirety on the customer's computer screen. (Id. at ¶¶ 4, 6, 8.) The acceptance screen of the registration system gave the customer two options: (1) he could accept the terms of the Original Agreement by affirming that "I have read and agree to the above Terms of Service. I understand that selecting this option constitutes my electronic signature accepting these terms"; or (2) he could reject the Original Agreement by stating that "I do not agree with the Terms of Service and do not wish to subscribe to Verizon Online DSL Service." (Id. at ¶ 9.)

Verizon's records show that Sacchi completed the registration process on September 24, 2005, which included accepting the Original Agreement. (Lamison Cert. at ¶ 4.) As part of the registration process, a Verizon email address was generated for Sacchi with the user identification code "vzeqzn7y@verizon.net." (Id. at ¶ 5.) Sacchi selected as a user name for that identification code, "johnsacchi@verizon.net." (Id.) Sacchi was given the opportunity to provide an alternative email address but did not do so at that time. He later provided the alternative email address "StephenSimoni@yahoo.com," which is the email address of Plaintiff's counsel in this action. (Id. at ¶ 6.)

The Original Agreement did not contain an arbitration clause, but did include a clause entitled "Revisions" (the "Revisions Clause"), which stated in relevant part:

> "We may revise the terms and conditions of this Agreement from time to time (including any of the policies which may be applicable to usage of the Service) by posting such revisions to the Website at the Resource Center under Announcements. You agree to visit these pages periodically to be aware of and review any such revisions. . . . [R]evisions to . . . terms and conditions shall be effective upon posting. By continuing to use the Service after revisions are in effect, you accept and agree to the revisions and to abide by them. If you do not agree to the revision(s), you must terminate your Service immediately."

3

(Original Agreement § 6.) The Original Agreement also provided that "Notices by Verizon to you shall be deemed given: (a) when sent to your Verizon email address, or (b) when deposited in the United States mail addressed to you at last-known address . . . . Notice of changes to this Agreement and these Terms of Service will be deemed given upon posting to the pages on the Website as set forth in Paragraph 6, Revisions, above." (Original Agreement § 18.1.)

In December 2011, Verizon amended the Original Agreement (as amended since 2005) to include an arbitration provision and class action waiver (the "Arbitration Clause"). (Opie Cert. at ¶ 5; Opie Cert. Ex. B. Verizon Internet Terms of Service (the "Amended Agreement") § 18.) The Arbitration Clause provides:

> **WE HOPE TO MAKE YOU A HAPPY CUSTOMER, BUT IF THERE'S AN ISSUE THAT NEEDS TO BE RESOLVED, THIS SECTION OUTLINES WHAT'S EXPECTED OF BOTH OF US.** YOU AND VERIZON BOTH AGREE TO RESOLVE DISPUTES ONLY BY ARBITRATION OR IN SMALL CLAIMS COURT. . . . WE ALSO BOTH AGREE THAT: THE FEDERAL ARBITRATION ACT APPLIES TO THIS AGREEMENT. EXCEPT FOR SMALL CLAIMS COURT CASES THAT QUALIFY, ANY DISPUTE THAT IN ANY WAY RELATES TO OR ARISES OUT OF THIS AGREEMENT OR FROM ANY EQUIPMENT, PRODUCTS AND SERVICES YOU RECEIVE FROM US (OR FROM ANY ADVERTISING FOR ANY SUCH PRODUCTS OR SERVICES) WILL BE RESOLVED BY ONE OR MORE NEUTRAL ARBITRATORS BEFORE THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR BETTER BUSINESS BUREAU ("BBB"). YOU CAN ALSO BRING ANY ISSUES YOU MAY HAVE TO THE ATTENTION OF FEDERAL, STATE OR LOCAL GOVERNMENT AGENCIES, AND IF THE LAW ALLOWS, THEY CAN SEEK RELIEF AGAINST US FOR YOU.

(Amended Agreement §§ 18, 18.1.)

 The provision goes on to state:

> **THIS AGREEMENT DOES NOT ALLOW CLASS OR COLLECTIVE ARBITRATIONS EVEN IF THE AAA OR BBB PROCEDURES OR RULES WOULD.  NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, THE ARBITRATOR SHALL NOT HAVE THE POWER TO DETERMINE THAT CLASS ARBITRATION IS PERMISSIBLE. . . . THE**

4

**ARBITRATOR SHALL HAVE POWER TO AWARD MONEY OR IN-
JUNCTIVE RELIEF ONLY IN FAVOR OF THE INDIVIDUAL PARTY
SEEKING RELIEF AND ONLY TO THE EXTENT NECESSARY TO PRO-
VIDE RELIEF WARRANTED BY THAT PARTY'S INDIVIDUAL CLAIM.**

(Id. at § 18.3.)[4]  The Amended Agreement by its terms replaced the Original Agreement (as

amended since 2005). (Opie Cert. at ¶ 5; Amended Agreement § 15.7 ("This Agreement . . .

constitutes the entire agreement between you and Verizon with respect to the subject matter hereto

and supersedes any and all prior or contemporaneous agreements whether written or oral."))

The Amended Agreement was posted to Verizon's website. (Opie Cert at ¶ 7.)  On June

21, 2012, Verizon also sent an email regarding the amendments to both Plaintiff's Verizon email

address and the additional email address Plaintiff provided to Verizon (StephenSimoni@ya-

hoo.com). (Id. at ¶¶ 9, 10.)  The subject of the email read "Notice of Revised Verizon Terms of

Service." (Id. at ¶ 7, Ex. C.)  The email stated:

> At Verizon, we continue our efforts to inform you about changes to your services,
> so we wanted to let you know that the Terms of Service . . . have been revised . . .
> : [T]he terms now require that you and Verizon resolve disputes only by arbitration
> or in small claims court. . . . By continuing to use the services after the date of this
> notice, you accept and agree to abide by the revised terms.  For more information,
> visit www.verizon.com/terms/disputes and to review the revised terms of service,
> visit www.verizon.com/terms.

(Id.)  Verizon's records indicate that both emails were successfully delivered, and that the email

to StephenSimoni@yahoo.com was opened on the same day it was delivered. (Id. at ¶¶ 9, 10.)

Verizon also included in Sacchi's July 2012 billing statement a section titled "Need-to-

Know Information" with a subheading titled "Notice of Revised Terms of Service." (Id. at ¶ 11,

Ex. D.)  This subsection stated:

> "The . . . Terms of Service have been revised . . . .  The terms now require that you
> and Verizon resolve disputes only by arbitration or in small claims court. . . . By
> using the Services after the date of this notice, you accept and agree to abide by the

---

[4] The Amended Agreement also provides for "Voluntary Mediation," whereby the customer may choose to
participate in Verizon's "free internal mediation program." (Id. at § 17.)

revised terms.    For more information, visit verizon.com/terms/disputes and
verison.com/terms.

(Id., Ex. D.)[5]

Plaintiff did not terminate his Verizon internet service until September 2014.  (Tr. of Oral

Argument at 5.)  As such, Verizon contends that Plaintiff has accepted the terms of the Amended

Agreement and that all of his claims are covered by the arbitration provision.  The Court agrees.

## DISCUSSION

### I.    Legal Standard

The Federal Arbitration Act (the "FAA") creates a "body of federal substantive law of

arbitrability, applicable to any arbitration agreement within the coverage of the [FAA]."  Moses

H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983).  The FAA provides that

an arbitration provision in "a contract evidencing a transaction involving commerce . . . shall be

valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the

revocation of any contract."  9 U.S.C. § 2.

The FAA "establishes a national policy favoring arbitration when the parties contract for

that mode of dispute resolution."  Preston v. Ferrer, 552 U.S. 346, 349 (2008).  In deciding whether

to compel arbitration, a court must consider "(1) whether the parties have entered into a valid

agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the

arbitration agreement."  In re American Exp. Fin. Advisors Sec. Litig., 672 F.3d 113, 128 (2d Cir.

2011).

Because an agreement to arbitrate is a "creature of contract . . . the . . . question of whether

the parties agreed to arbitrate is determined by state law."  Bell v. Cendant Corp., 293 F.3d 563,

566 (2d Cir. 2002).  Thus, when deciding whether there is a valid agreement to arbitrate, courts

---

[5] The Amended Agreement has since been further amended in ways not relevant here.  (Id. at ¶ 12, Ex. E.)

6

"should apply ordinary state-law principles that govern the formation of contracts." Id. (quoting First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995)). "Allegations related to the question of whether the parties formed a valid arbitration agreement . . . are evaluated to determine whether they raise a genuine issue of material fact . . . ." Schnabel v. Trilegiant Corp., 697 F.3d 110, 113 (2d Cir. 2012).

"The issue of an arbitration agreement's scope is governed by 'the federal substantive law of arbitrability' . . . ." Progressive Cas. Ins. Co. v. Reaseguradora Nacional De Venezuela, 991 F.2d 42, 48 (2d Cir. 1993) (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985)). The arbitrability of a claim therefore "must be addressed with a healthy regard for the federal policy favoring arbitration . . . . The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ." Id (quoting Mitsubishi Motors, 473 U.S. at 626). "[U]nless it can be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute, the dispute should be submitted to arbitration." Concourse Village, Inc. v. Local 32E, Serv. Emps. Int'l Union, AFL-CIO, 822 F.2d 302, 304 (2d Cir. 1987) (internal quotation marks omitted).

**II.     Valid Agreement to Arbitrate**

Plaintiff does not dispute that he validly entered into the Original Agreement. Instead, he argues that the amendments to the Original Agreement are not enforceable because the amendment procedure as provided in the Original Agreement's Revisions Clause is "ineffective to modify the contract pursuant to New Jersey law." (Opp. at 2.) Although Plaintiff does not explicitly use the term, he appears to argue that the Revisions Clause is unconscionable. Specifically, Plaintiff takes

issue with the Revisions Clause's "mandat[e] that the Consumer repeatedly search out 'Announce-ments' hidden in tertiary levels of Verizon's website" and its deeming as acceptance "the Consumer's failure to terminate service 'immediately.'" (Id.) Since the process by which amend-ments to the Original Agreement are effected is unconscionable, Plaintiff contends, any amendments made pursuant to the Revisions Clause, including the addition of the Arbitration Clause, are unenforceable. On this line of reasoning, there was thus no valid agreement to arbi-trate.[6] Verizon counters that courts "routinely approve provisions in customer agreements that deem the customer's continued acceptance of services as assent to changed terms." (Mot. to Comp. at 12.)

The Court agrees with Verizon that under New Jersey law, silence may be deemed ac-ceptance. See, e.g., Order, Mayer v. Verizon New Jersey, Inc., No. 13-3980-FSH (D.N.J. May 6, 2014), ECF No. 31 (finding acceptance of amendments through continued use of services pursuant to contracts substantially similar to the ones at issue here); Coiro v. Wachovia Bank, N.A., No. CIV. 11-3587, 2012 WL 628514, at *3 (D.N.J. Feb. 27, 2012) (finding acceptance through silence and stating that "[u]nder New Jersey state law, silence may be deemed acceptance 'where the particular circumstances reasonably impose on the offeree a duty to speak if the offer is rejected.'"

---

[6] A threshold issue that neither party raised is which state's law governs this unconscionability analysis. The Original Agreement contains a choice of law provision stating that "You and Verizon agree that the substantive laws of the Commonwealth of Virginia . . . will be applied to govern, construe and enforce all of the rights and duties of the parties arising from or relating in any way to the subject matter of this Agreement." (Original Agreement § 19.4.) The Amended Agreement, however, contains a different choice of law provision stating that the FAA and "the sub-stantive laws of the state of the customer's billing address [here, New Jersey]" will apply. (Amended Agreement § 15.4.) While both parties have briefed this issue under New Jersey law, it is not clear that the unconscionability of the Original Agreement's Revisions Clause should not be governed by Virginia law, which, by the terms of the Orig-inal Agreement's choice of law provision, governs the rest of that agreement. Nevertheless, since neither party raised this choice of law issue and both parties briefed the issue under New Jersey law, the Court deems the parties to have consented to application of New Jersey law. See, e.g., Tehran-Berkeley Civil & Envtl. Engineers v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989) (where neither party argued the choice of law issue and relied on New York law in the briefing, the principle of implied consent to use a forum's law established that New York law would apply).

8

(quoting Johnson & Johnson v. Charmley Drug Co., 11 N.J. 526, 539 (1953)); Weichert Co. Real-
tors v. Ryan, 128 N.J. 427, 436-37 (1992) ("[W]here an offeree gives no indication that he or she
objects to any of the offer's essential terms, and passively accepts the benefits of an offeror's
performance, the offeree has impliedly manifested his or her unconditional assent to the terms of
the offer.")

This determination, however, does not resolve the issue. The other part of Plaintiff's ar-
gument is that the system of notice instituted by the Revisions Clause – whereby the customer
must periodically check the website for amendments to the terms of service – is unconscionable.
Neither Coiro nor Klein v. Verizon Commc'ns, Inc., 920 F. Supp. 2d 670 (E.D. Va. 2013), relied
on by Verizon, speak to this issue since the court in both cases only discussed notice of the amend-
ments sent by mail or email.[7] While Plaintiff succeeds in pointing out these distinguishing factors
in Coiro and Klein, he does not cite to any authority whatsoever to affirmatively support his posi-
tion.

The Court's own research on this issue has not revealed a clear answer. New Jersey courts
have not directly addressed the issue. While Rudbart v. North Jersey Dist. Water Supply Com'n,
127 N.J. 344 (1992) holds that early-redemption notice by publication in the securities context is
valid where it was agreed in the notes and offering documents that such notice by publication
would be employed – which could loosely be analogized to notice of the contract amendments by
website posting pursuant to the Revisions Clause – Rudbart was specifically premised on "the fact
that the . . . notes [in question] were publicly-traded securities . . . [and] not consumer necessities."
Id. at 356, 360-61. Since the internet service at issue here is far removed from publicly-traded
securities, Rudbart's holding is inapplicable to the instant case.

---

[7] Moreover, Klein applied Maryland law, not New Jersey law.

Courts in other jurisdictions have dealt with the notice-by-web-posting issue more directly, although there is no consensus on whether these kinds of amendments are enforceable. In Douglas v. U.S. Dist. Court for Cent. Dist. of California, 495 F.3d 1062 (9th Cir. 2007), changes to a service contract were posted on the service provider's website but no other notice was given to the customer. Id. at 1066. The court held that the customer's continued use of services could not be considered assent to the new terms because he was not given sufficient notice of the changes. Id. at 1066-67. In so doing, the court stated that "[p]arties to a contract have no obligation to check the terms on a periodic basis to learn whether they have been changed by the other side." Id. at 1066.

Douglas differs from the case here where Plaintiff did have an obligation – by the express terms of the Revisions Clause – to "visit these [web]pages periodically to be aware of and review any such revisions." (Original Agreement § 6.) There is no indication in Douglas that the contract at issue ever contained a similar, agreed-upon clause, or even a clause stating that amendments would be posted on the service provider's website.

Subsequent cases have similarly distinguished Douglas and work in Verizon's favor. In Patco Const. Co. v. People's United Bank, No. 2:09-CV-503-DBH, 2011 WL 2174507 (D. Me. May 27, 2011) report and recommendation adopted sub nom. Patco Const. Co. v. Peoples United Bank, No. CIV. 09-503-P-H, 2011 WL 3420588 (D. Me. Aug. 4, 2011) aff'd in part, rev'd in part on other grounds sub nom. Patco Const. Co. v. People's United Bank, 684 F.3d 197 (1st Cir. 2012), the court held that Patco was bound by a modified banking agreement posted online where there was no dispute that Patco agreed to the original agreement, which reserved the right for the bank "to modify the terms and conditions of that agreement at any time effective upon publication." Id. at *25. The court distinguished Douglas, noting that there was "no suggestion that the individual

10

[in that case] had entered into an agreement with [the service provider] for modification of that agreement upon online posting by [the service provider.]" Id. at *25 n.126.

Likewise, in Harold H. Huggins Realty, Inc. v. FNC, Inc., 575 F. Supp. 2d 696, 707-08 (D. Md. 2008), the court held that unilateral amendments posted on the defendant's website in accordance with the modification clauses in the earlier agreements were effective. There, the earlier agreements permitted modification by FNC "at any time" and provided that "[w]henever changes are made, the revised agreement will be posted [online] at this location. New terms will be effective 30 days after the changes are posted. You will be asked to acknowledge your acceptance of the changes the first time you log in after the changes have been made." Id. at 706. The court held that even as to customers who were not asked to acknowledge their acceptance of the changes, by the plain terms of the original contracts, modifications were effective in any event 30 days after they were posted. Id. at 707-08 (construing the terms of the contract against the drafter, which in this case was seeking to invalidate its own modifications, and finding that "asking the user for acknowledgment is not necessary to effect modification, but is rather mere 'icing on the cake.'")

Conversely, in Roling v. E*Trade Sec., LLC, 756 F. Supp. 2d 1179, 1190-91 (N.D. Cal. 2010), the court held that a modifications clause substantially similar to the Revisions Clause here was unenforceable. There, the original agreement provided that "this Agreement may be amended from time to time by E*TRADE Securities, with revised terms posted on the E*TRADE Financial Web site. I agree to check for updates to this Agreement. I understand that by continuing to maintain my Securities Brokerage Account without objecting to revised terms of this Agreement, I am accepting the terms of the Revised Agreement and I will be legally bound by its terms and conditions." Id. at 1190. The court held that this modification provision is unenforceable because it allowed "unilateral[] change [in] the terms of the contract without notice." Id. at 1191.

11

Without clear guidance from New Jersey courts and with contradictory holdings across jurisdictions, Plaintiff's unconscionability claim does not lend itself to straightforward resolution. But the Court need not decide this issue in order to determine whether there was a valid agreement to arbitrate in this particular case. Whether or not amendments posted to Verizon's website provided sufficient notice to Plaintiff, the fact remains that Plaintiff subsequently received other forms of notice that adequately informed him of the amendments and that clearly provided that continued use of Verizon's services would be deemed acceptance of the new terms.

It is not disputed that Plaintiff received affirmative notice of the amendments – specifically, the addition of the Arbitration Clause – on at least three occasions, in addition to the posting of the amendments to the website: (1) on June 21, 2012, Verizon sent an email with a subject that read "Notice of Revised Verizon Terms of Service" to Plaintiff notifying him of the new Arbitration Clause; (2) on the same day, Verizon sent a separate but identical email to Plaintiff's counsel's email address; and (3) in July 2012, Plaintiff was notified again of the new Arbitration Clause via the billing statement mailed to his address. (Opie Cert. at ¶¶ 9-11.) Each of these notices provided links to both the amended terms of service itself, as well as an information page explaining the new dispute resolution procedures. (Opie Cert., Ex. C, D.) Further, each of the notices specifically stated that "[b]y continuing to use the services after the date of this notice, you accept and agree to abide by the revised terms." (Id.) After each notice, Plaintiff continued to use his Verizon services, thereby accepting the revised terms, including the arbitration clause. See, e.g., Order, Mayer v. Verizon New Jersey, Inc., No. 13-3980-FSH (D.N.J. May 6, 2014), ECF No. 31 (in substantially similar factual circumstances, finding acceptance of amendments through continued use of services after the plaintiff was notified "via email, billing statements and notifications on

Verizon's website");[8] Coiro, 2012 WL 628514, at *3 (continued use of services was deemed acceptance where the terms of modification so provided); but see Discover Bank v. Shea, 362 N.J. Super. 200, 209-10 (Ch. Div. 2001) (finding that an amendment to an agreement included with a monthly statement – a "bill stuffer" – was insufficient to effect notice of the amendment).[9]  Plaintiff therefore validly agreed to the Amended Agreement's arbitration provisions.

Plaintiff's remaining arguments to the contrary are unavailing.  Plaintiff argues that the subsequent notifications cannot serve to bind him to the amendments because these "alternative notifications" do not satisfy the explicit procedures of the Revisions Clause.  (Opp. at 3.)  But Plaintiff cannot have it both ways.  If the Revisions clause validly provides for notice procedures, as this argument assumes, then the posting of the amendments to the website are all that were necessary to bind him to the amendments, and the additional notifications are irrelevant to the issue of contract formation.  Plaintiff therefore cannot logically argue both that the subsequent notices are invalid for failure to abide by the Revisions Clause and, in the same breath, that even though Verizon did otherwise abide by the Revisions Clause – which is undisputed – Plaintiff is still not bound by the amendments.

---

[8] Plaintiff argues that because the contract in Mayer specifically provided for notice via email or mail, that case is distinguishable from the instant case, where the Revisions Clause did not mention providing notice by email or mail.  (See Letter to the Court, ECF No. 15.)  However, the contract at issue in Mayer provided that "All other changes to these Terms of Service will be effective upon posting to our Website or will be sent to you [by mail or email.]"  Order, Mayer v. Verizon New Jersey, Inc., No. 13-3980-FSH, at 2 n.4 (D.N.J. May 6, 2014), ECF No. 31 (emphasis added).  Thus, just as here, the defendant in Mayer was under no obligation to send email or mail notifications once the amendments were posted to the website, although it chose to do so, just as Verizon did here.  The fact that this notice option was written out more explicitly in the Mayer agreement than in the agreement here is of no import.

[9] In Cohen v. Chase Bank, N.A., 679 F. Supp. 2d 582, 591 (D.N.J. 2010), a federal district court noted that "Shea is the decision of a New Jersey state trial court, and is neither binding nor necessarily persuasive in this Court's analysis of applicable New Jersey law." As such, the Cohen court stated that it "does not look to Shea as an indication of New Jersey public policy." Id. at 592. Moreover, the decision in Shea was based largely on the fact that the plaintiff never saw the notice, whereas Plaintiff here has never so claimed.  See Shea, 362 N.J. Super. at 209.  Plaintiff here also received additional email notification, and it is undisputed that, at the very least, Plaintiff's counsel in this very matter opened the notice email on the same day it was delivered. (Opie Cert. at ¶ 10.)  Finally, later cases like Mayer indicate that notice of amendments via email and billing statements are valid.

Plaintiff next contends that because the notices were provided six months after the purported effective date of the amendment, they somehow cannot serve to provide adequate notice of the amendments. (Opp. at 3.) Plaintiff again provides no support for this contention. In any event, as discussed above, Plaintiff agreed to the amendments by continuing to use the services after receipt of the notices and continued to be bound by them, regardless of when he received (and agreed to) them. To be sure, this would be a closer question if Plaintiff had canceled his service upon receiving notice, since he would have manifested his refusal to be bound by the amendments. But that is not the case here. Plaintiff did not terminate his Verizon service until September 2014 – years after receipt of these notices – and their six-month belatedness is thus of no import.

Finally, Plaintiff argues, without citing any authority, that because the notices failed to mention the Arbitration Clause's ban on class-wide arbitration, they did not provide adequate notice as to those amendments. (Opp. at 3-4.) New Jersey law says otherwise. Notice of the terms of an agreement is sufficient where the offeree is given "adequate notice of the existence of additional documents" that contain those terms. Tantillo v. CitiFinancial Retail Servs., Inc., No. CIV.A. 12-511 MLC, 2013 WL 622147, at *9 (D.N.J. Feb. 19, 2013) (citing Daley v. Int'l Furniture, No. L-7503-05, 2006 WL 6490972 (N.J. Super. Sept. 22, 2006)). In Tantillo, the plaintiff signed an application for a line of credit that incorporated by reference "the terms and conditions of the attached agreement," which in turn contained an arbitration provision. Id. The plaintiff argued that since the agreement containing the arbitration provision was never presented to her, she never consented to arbitration. Id. at *7. The court disagreed, finding that the plaintiff had "adequate notice of the existence of additional documents" and therefore the parties "reached a meeting of the minds regarding the [a]rbitration [p]rovision." Id. at *9; see also Schwartz v. Comcast Corp., 256 F. App'x 515, 520 (3d Cir. 2007) (applying Pennsylvania law) ("It is true that in

14

some cases, a party is excused from the terms of a contract where he never had access to the
contract and thus could not make himself aware of its terms. However, in this case, the terms of
the contract were available to Schwartz via the web site, and thus they are binding, despite the fact
that he was unaware of them.").

Here, Plaintiff was given explicit notice of the existence of the Amended Agreement, as
well as the Arbitration Clause, and was provided a link to the Amended Agreement. This was
sufficient to give "notice of the existence of additional documents" containing the class arbitration
waiver. Tantillo, 2013 WL 622147, at *9. Therefore, when Plaintiff continued to use his Verizon
services after receipt of the notices, he consented to the terms of the Amended Agreement, includ-
ing the class arbitration waiver.

In sum, Plaintiff and Verizon entered into a valid agreement to arbitrate.

## III.     Scope of the Arbitration Provision

Plaintiff next argues that even if there were a valid agreement to arbitrate, his claims in this
action fall outside of the Arbitration Clause's scope. Plaintiff's injuries accrued in 2009 and 2010,
the period in which he subscribed to the more expensive DSL service. (Opp. at 4-5.) The earliest
that the terms of service could have been amended to include the Arbitration Clause, however,
assuming the Revisions Clause is valid, is December 2011. (Opie Cert. at ¶ 5.) Plaintiff therefore
argues that his pre-amendment claims are not subject to the Arbitration Clause.

To determine whether a particular dispute falls within the scope of an agreement's arbitra-
tion clause, a court must first classify the clause as either broad or narrow. Louis Dreyfus Negoce
S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 224 (2d Cir. 2001). "[V]ery expansive
language . . . will generally suggest a broad arbitration clause." Id. at 225. Broad arbitration
clauses enjoy a "presumption of arbitrability." Id. at 224 (internal quotations omitted).

15

Courts generally "give retroactive application to broad arbitration clauses . . . ." Levins v. Alms & Assocs., Inc., 634 F.3d 260, 268 (4th Cir. 2011). The Second Circuit has held that an arbitration clause that applied by its terms to "any controversy" between members covered claims that accrued before the members entered into the agreement. Coenen v. R.W. Pressprich & Co., 453 F. 2d 1209, 1212 (2d Cir. 1972). Likewise, in Smith/Enron Cogeneration Ltd. P'Ship, Inc. v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 98-99 (2d Cir. 1999), the Second Circuit held that an arbitration clause with no temporal limitation and that covered "any dispute, disagreement, controversy or claim arising under or relating to any obligation or claimed obligation under the provisions of this Agreement" applied retroactively.

Here, the arbitration clause is clearly a "broad" one. It uses "very expansive language" covering "any dispute that in any way relates to or arises out of this agreement or from any equipment, products and services you receive from [Verizon] (or from any advertising for any such products or services) . . . ." (Amended Agreement § 18.1.); see also Continental Ins. Co. v. M/V "NIKOS N", No. 00-CV-7985-RLC, 2002 WL 530987, at *4 (S.D.N.Y. Apr. 9, 2002) ("The quintessential 'broad' arbitration clause applied, by its terms, to 'all disputes arising under the charterparty.'" (internal quotation marks omitted)). The Arbitration Clause here thus applies retroactively to Plaintiff's claims.

Plaintiff's attempt to read a temporal limitation into the broad arbitration provision fails. Plaintiff points to a prefatory phrase of the Arbitration Clause, which reads, "We hope to make you a happy customer . . ." and argues that, based on this commercial nicety, the arbitration clause is "explicitly written to provide only a prospective effect . . . ." (Opp. at 5 (quoting Amended Agreement § 18.)) This prefatory clause falls short of rebutting the broad arbitration clause's presumption of arbitrability. See Concourse Village, 822 F.2d at 304 ("[U]nless it can be said with

positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute, the dispute should be submitted to arbitration." (internal quotation marks omitted)). Even if this prefatory clause were deemed to raise an ambiguity as to the temporal dimensions of the arbitration provision, in accordance with the federal policy favoring arbitration, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ." Moses H. Cone Mem'l Hosp., 460 U.S. at 24-25.

## IV.    Unconscionability of Class Waiver of Pre-Amendment Claims

Lastly, Plaintiff contends that even if the Arbitration Clause does encompass his pre-amendment claims, the Arbitration Clause is nevertheless unconscionable because it requires class waiver as to those pre-amendment claims. (Opp. at 4-5.) Specifically, Plaintiff argues that "New Jersey law prohibits as unconscionable such provisions that require Consumers to waive their rights to pursue class litigation for past wrongful conduct as a condition of their future utilization of the subject service." (Opp. at 5.) Plaintiff provides no authority to support this contention. To the contrary, the Supreme Court's decision in AT&T Mobility LLC v. Concepcion, 131 S. Ct. 1740, 1748 (2011) makes clear that federal policy favoring arbitration preempts state law that deems class waivers unconscionable. See also Litman v. Cellco P'ship, 655 F.3d 225, 231 (3d Cir. 2011) ("We understand the holding of Concepcion to be both broad and clear: a state law that seeks to impose class arbitration despite a contractual agreement for individualized arbitration is inconsistent with, and therefore preempted by, the FAA, irrespective of whether class arbitration is desirable for unrelated reasons. Therefore, we must hold that . . . the [contrary] rule established by the New Jersey Supreme Court . . . is preempted by the FAA." (internal quotation marks omitted)). Concepcion explained in great detail how class arbitration, when not agreed to by the parties,

is inconsistent with the purposes of the FAA and thus cannot be required by state law.  See Con-cepcion, 131 S.Ct. at 1751-53 (class arbitration would make informal arbitration "slower, more costly, and more likely to generate procedural morass than final judgment"; class arbitration would require "procedural formality" and it is "unlikely" that Congress "meant to leave the disposition of these procedural requirements to an arbitrator"; "class arbitration greatly increases risks to de-fendants"; "arbitration is poorly suited to the higher stakes of class litigation").  It would be a perverse reading of Concepcion, particularly in light of the fact that federal law also permits ret-roactive application of broad arbitration clauses, as discussed above, to find that its reasoning applies only to post-agreement claims but not pre-agreement claims that otherwise fall within the scope of the arbitration clause.

The class waiver therefore validly applies to Plaintiff's pre-amendment claims.

## CONCLUSION

Verizon's motion is GRANTED.  The Clerk of the Court is respectfully requested to close this motion on the docket.  This case shall be stayed pending arbitration.

SO ORDERED.

Dated:      February 23, 2015
            New York, New York

Ronnie Abrams
United States District Judge